UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KATIE G., <br><br> Plaintiff, <br><br> v. <br><br> NANCY A. BERRYHILL, Acting Commissioner of Social Security, <br><br> Defendant. | Case No.: 18-cv-00801-JLS (JLB) <br><br> **REPORT AND RECOMMENDATION REGARDING JOINT MOTION FOR JUDICIAL REVIEW OF FINAL DECISION OF THE COMMISSIONER OF SOCIAL SECURITY** <br><br> **(ECF No. 13)** |

This Report and Recommendation is submitted to the Honorable Janis L. Sammartino, United States District Judge, pursuant to 28 U.S.C. § 636(b)(1) and Local Civil Rule 72.1(c) of the United States District Court for the Southern District of California.

On April 25, 2018, Plaintiff Katie G. ("Plaintiff") filed a Complaint pursuant to 42 U.S.C. § 405(g) seeking judicial review of a decision by the Commissioner of Social Security denying her applications for a period of disability and disability insurance benefits and for Supplemental Security Income benefits ("SSI"). (ECF No. 1.)

Now pending before the Court and ready for decision is the parties' Joint Motion for Judicial Review of Final Decision of the Commissioner of Social Security. (ECF No. 13.) For the reasons set forth herein, the Court **RECOMMENDS** that Judgment be entered

**REVERSING** the decision of the Commissioner denying benefits and **REMANDING** the matter to the Commissioner for further administrative action consistent with this decision.

## I. PROCEDURAL BACKGROUND

On June 30, 2014, Plaintiff filed applications for a period of disability and disability insurance benefits and SSI under Titles II and XVI, respectively, of the Social Security Act, alleging disability since August 13, 2013. (Certified Administrative Record ["AR"] 268-74, 275-80.) After her applications were denied initially and upon reconsideration (AR 170-74, 180-86), Plaintiff requested an administrative hearing before an administrative law judge ("ALJ") (AR 178-79). An administrative hearing was held on July 7, 2016 and a supplemental hearing was held on November 9, 2016. (AR 28-55, 56-92.) Plaintiff appeared at the initial hearing with counsel, and testimony was taken from her and a vocational expert ("VE"). (AR 56-92.) Plaintiff also appeared at the supplemental hearing with the same counsel and testimony was taken from her, a different VE, and a medical expert. (AR 28-55.)

As reflected in his March 1, 2017 hearing decision, the ALJ found that Plaintiff had not been under a disability, as defined in the Social Security Act, from her alleged onset date through the date of the decision. (AR 6-27.) The ALJ's decision became the final decision of the Commissioner on February 26, 2018, when the Appeals Council denied Plaintiff's request for review. (AR 1-5.) This timely civil action followed.

## II. SUMMARY OF THE ALJ'S FINDINGS

In rendering his decision, the ALJ followed the Commissioner's five-step sequential evaluation process. *See* 20 C.F.R. §§ 404.1520, 416.920. At Step One, the ALJ found that Plaintiff had not engaged in substantial gainful activity since August 13, 2013, her alleged onset date. (AR 11.)

At Step Two, the ALJ found that Plaintiff had the following severe impairments: cervical and lumbar degenerative disc disease (DDD) and related conditions, and osteoarthritis of the knee and hip. (AR 11.)

///

At Step Three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the impairments listed in the Commissioner's Listing of Impairments. (AR 13.)

Next, the ALJ determined that Plaintiff had the residual functional capacity ("RFC") to perform light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b). (AR 13.) Specifically, the ALJ determined:

> [C]laimant could lift and/or carry ten pounds frequently, twenty pounds occasionally; she can stand and/or walk for six hours out of an eight-hour workday; she can sit for six hours out of an eight-hour workday; she can occasionally climb ramps and stairs, balance, stoop, kneel, crouch and crawl; she is not to climb ladders, ropes or scaffolds; and she is to avoid all exposure to hazards such as unprotected heights and moving machinery.

(AR 13.)

At Step Four, the ALJ determined that Plaintiff was capable of performing past relevant work as an information clerk, customer services representative, and sales attendant. (AR 18-19.) Based on the VE's testimony, the ALJ determined that Plaintiff remained capable of performing this past relevant work "as actually performed." (AR 18-19.)

Alternatively, the ALJ made a determination at Step Five. Based on the VE's testimony that a hypothetical person with Plaintiff's vocational profile and RFC could perform the requirements of representative occupations such as a survey worker that existed in significant numbers in the national economy, the ALJ found that Plaintiff was not disabled. (AR 19-20.)

## III. DISPUTED ISSUES

As reflected in the Joint Motion for Judicial Review of Final Decision of the Commissioner of Social Security, the disputed issues that Plaintiff is raising as the grounds for reversal are:

1. Whether the ALJ provided legally sufficient reasons to reject Plaintiff's testimony about her pain and symptoms.

2. Whether the ALJ's decision to reject the opinions of Dr. Avery and Dr. Paniccia was justified by specific and legitimate reasons supported by substantial evidence.

(ECF No. 13 at 12.)

## IV. STANDARD OF REVIEW

Under 42 U.S.C. § 405(g), this Court reviews the Commissioner's decision to determine whether the Commissioner's findings are supported by substantial evidence and whether the proper legal standards were applied. *DeLorme v. Sullivan*, 924 F.2d 841, 846 (9th Cir. 1991). Substantial evidence means "more than a mere scintilla" but less than a preponderance. *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Desrosiers v. Sec'y of Health & Human Servs.*, 846 F.2d 573, 575-76 (9th Cir. 1988). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401. This Court must review the record as a whole and consider adverse as well as supporting evidence. *Green v. Heckler*, 803 F.2d 528, 529-30 (9th Cir. 1986). Where evidence is susceptible of more than one rational interpretation, the Commissioner's decision must be upheld. *Gallant v. Heckler*, 753 F.2d 1450, 1452 (9th Cir. 1984).

## V. DISCUSSION

### A. The ALJ's Adverse Credibility Determination

In her motion, Plaintiff contends that the ALJ failed to make a proper adverse credibility determination with respect to Plaintiff's subjective symptom testimony. (ECF No. 13 at 12-24.)

#### 1. Plaintiff's Testimony

##### a. *Disability Reports (July, October, and December 2014)*

In a Disability Report dated July 2, 2014, Plaintiff states that she is unable to work due to chronic neck pain, carpal tunnel syndrome, back pain, major depression, and arthritis in her neck, back, and knees. (AR 325-34.) She also states the following:

///

Can't take meds—She has colitis—Stomach can't handle meds because of old ulcers in her – Low thyroid Has chronic neck pain which causes numbness down her arms right hand surgery for carpel tunnel 1/2011 broke leg put 11 screws and plate in leg due to her right leg injuries she has compensated and now has injuries on her left leg uses a cane to walk sometimes has to use crutches doing physical therapy unable to bend over ruptured discs sitting 10-15 min then legs going numb walk – 2 blocks standing – 15 min causes back and legs to be in pain comfortable position is laying down – has to lay down at least 5-6 times a day has mood swings and very irritable due to pain and depression[.]

(AR 334; *see also* AR 340, 357.)

In a Disability Report dated October 3, 2014, Plaintiff provides the following update:

[Plaintiff is] unable to sleep from stress and pain all night long, always worried and depressed about money, has pain using the phone holding the phone or using a headset causes pain in shoulders and neck pain will be a 2 out of 10 from using the phone or tilting her head, shoulder pains, arm pains, stomach hurts f[ro]m colitis and IBS are both extreme from stress, muscle pain in arms and legs, wrists and hands both have pain, hips are both painful and sore since injury on right shin has been hurting due to having to put most of her weight on that side, sometimes she feels it's going to break, feet hurt and swell with walking, standing and even sitting, burning pains and numbness in legs and feet, she cannot pay attention like she used to her mind wonders, she is also uptight stressed and depressed all the time, hypothyroidism causes her to feel tired all the time.  Spondylosis sciatica pinched nerves on her back cause a lot of pain, walks slow because of pain.

(AR 361.)

Plaintiff also reports the following changes to her daily activities:

[Plaintiff] now has problems with right leg now because of compensation of the left leg, she has a pinched nerve in her neck from the before, she has carpal tunnel on her hands, she still has numbness and tingling, she has difficulty sleeping, she can't lift heavy items, before she was able to lift 2-3 lbs and now she can't even do that, even if she gains a little bit of weight her legs start feeling the stress, she can't sit for too long, she has numbness going down the legs if she sits too long, she can't squat, and her back gets really bad, to get in the shower she has difficulty, hips cause a lot of pain, can't cook because she can't stand long enough.  When her stress is bad, her colitis acts up. Sometimes she feels dizzy and has to sit down.  When pain gets really sharp she can't do anything, she is afraid that it will break.  She has a shower chair

to help out.  Headaches from stress or neck discs from neck injury since 1993, stress could cause the pain from grinding teeth pain runs a 6 out of 10.

(AR 361.)

In a Disability Report dated December 18, 2014, Plaintiff provides the following update:

Client has back and neck pain, her carpal tunnel affects her ability to grasp items, she is unable to opens jars.  She cannot lift or even fold clothes.  This is another reason why she cannot even use the computer.  Has tingling and numbness that stem from her shoulder that radiate down to her finger tips.  Due to neck pain she is unable to lean forward or look down.  Feels more stressed and depressed due to her current situation.  Feels hopeless especially with combination of pain that she feels.

(AR 366.)

In addition, Plaintiff adds the following update:

Due to her condition she experiences numbness and pain in her lumbar area that radiate from her lower back to bilateral legs.  She cannot sit for more than 10-15 min, otherwise her legs start going numb.  She is unable to walk uphill, she can walk for about 5 minutes before she is in extreme pain.  Her muscle tense and the pain that radiates down her legs are intolerable.  Pain in hip area only allows her to stand for no more than 10 minutes.  Very moody and emotional due to her current situation.  She is depressed and is short tempered.  Feels like [illegible] up and wants to just give up.  She cries from the pain that she feels physically and emotionally.  [Illegible] time sleeping at night, pain in her legs, lumbar, cervical area, as well as, the stress and anxiety from these conditions prevent her from getting sleep.

(AR 366-67.)

Plaintiff also reports the following changes to her daily activities:

It takes client 30-40 minutes to take a shower.  It has taken her longer to get dressed because she feels unbalanced and is afraid to fall.  Experiences pain when putting her clothes on. Putting on her pants causes stress and pain that stem from below her knee downward, as well as, lower back and hip.  She cannot cook herself meals due to the carpal tunnel that prevents her from chopping food and her inability to stand for long periods.  She relies heavily on instant foods.  When going to the grocery store she needs assistance from

other such as her roommate or her nephew. When she is out of groceries she waits until someone can go with her, otherwise she cannot do it on her own.

. . .

Client has not been able to increase her activities. She is not able to enjoy going to the movies because she cannot sit for long periods of time. She isolates herself because she cannot engage in activities that she use[d] to enjoy doing, for example walking at the swap meet. She tries to save her strength for appointments such as physical therapy.

(AR 371.)

b. *Function Report—Adult (July 14, 2014)*

In a "Function Report—Adult," completed by Plaintiff's case manager and signed by Plaintiff on July 14, 2014, Plaintiff claims that her illnesses, injuries, and/or conditions limit her ability to work in the following ways:

Chronic neck pain gives headaches, can't turn head, causes stress and depression. Pain in mouth from grinding teeth. Carpal tunnel cannot use hands a lot of writing or typing, any repetative hand movements gives shooting pains in hand, drops items. Trouble sleeping. Depression causes crying spells, cries from pain and financial stress. Crys frequently. Feels down on life and always stressed. Arthritis causes pain. Bad memory from her accident, forgets daily things she should know. Back and [remainder cut off].

(AR 347.)

In the Function Report, Plaintiff describes her daily activities from the time she wakes up until the time she goes to bed as follows: "wakes up, eats breakfast, trys to clean a little, then has to relax [and] watch tv cause after movement pain will increase as the day goes on, eats lunch and dinner – goes to bed." (AR 348.) Plaintiff also claims the following: Before the onset of her illnesses, injuries, and/or conditions, Plaintiff was able to work, read, watch television, pay attention/focus, be active and social, volunteer, and go to the park. (AR 348, 351.) Now, Plaintiff's daily hobbies and interests include watching television and napping. (AR 351.) Plaintiff cannot sleep because she is in too much pain. (AR 348.) She also finds it hard to bend her legs and stand while she dresses, to move into

positions for shaving, and to sit and get up when using the toilet. (AR 348.) Plaintiff uses a shower chair for bathing. (AR 348.)

Plaintiff has a cat and a roommate. (AR 348.) Sometimes she feeds the cat, but her roommate helps with feeding the cat and scooping the litter box. (AR 348.) Plaintiff prepares her own meals every day. (AR 349.) Preparation of these meals includes making cereal and sandwiches and warming TV dinners and soup. (AR 349.) The meals typically take her no more than ten minutes to prepare. (AR 349.) Plaintiff used to be able to stand and cook large meals, but now she cannot stand or use her hands very well. (AR 349.) Plaintiff also engages in light dusting, approximately five to ten minutes once a week. (AR 349.) All remaining household chores cause her pain. (AR 349-50.)

Plaintiff goes outside every day and can drive and ride in cars. (AR 350.) Plaintiff can go out alone. (AR 350-51.) Once a week, Plaintiff spends less than thirty minutes at the grocery store. (AR 350.) Plaintiff also regularly goes to doctor's appointments, therapy, and other appointments. (AR 351) Plaintiff can count change, handle a savings account, and use checkbook/money orders, but she finds it difficult to maintain concentration and focus. (AR 350-51.) Plaintiff does not often spend time with others as she is too depressed, but she does not have any problems getting along with family, friends, neighbors, or others, and gets along very well with authority figures. (AR 351-53.)

Plaintiff has constant pain all over her body which affects all her movements. (AR 352.) She can only walk ten steps before needing to rest for forty-five minutes before she resumes walking. (AR 352.) Plaintiff uses crutches, a walker, a wheel chair, a cane, and/or a brace/splint. (AR 353.) She uses at least one of these aids all the time. (AR 353.) Plaintiff can only pay attention for fifteen to twenty minutes and cannot finish what she starts (*e.g.*, a conversation, chores, reading, watching a movie). (AR 352.) In addition, Plaintiff does not follow spoken instructions well and must read written instructions many times to understand. (AR 352.)

///

///

18-cv-00801-JLS (JLB)

c. *Administrative Hearing (July 7, 2016)*

At the initial hearing before the ALJ on July 7, 2016, Plaintiff testified that she could not work for the following reasons:

> Because of the pain that I'm going through. I have pain in my back and my neck and my hands. I have arthritis in my hands and I have carpal tunnel, both hands. I have the pinched nerves in my back and my neck make – the ones in my neck make my hands and my arms go numb, and the ones in my back, if I'm sitting more than 15-20 minutes, then I end up getting numbness from my waist down.

(AR 61-62.)

Plaintiff attended the hearing with a walker. (AR 62.) She testified that it helps her when she has to walk distances. (AR 62.) Plaintiff noted that over the course of a day she could walk one or two blocks without the help of an assistive device. (AR 62.) Plaintiff also testified that she has limits on how much she can lift and carry. (AR 62.) Plaintiff stated that her carpal tunnel "sometimes is worse than others," such that, on occasion, even a coffee mug is too heavy. (AR 62.) Plaintiff testified that sometimes she can only lift up to one or two pounds. (AR 62.) Plaintiff added that lifting five pounds takes a toll on her back. (AR 63.) Plaintiff noted that the more activity she does, the more pain she feels in her back. (AR 63.)

Plaintiff described her daily activities as follows:

> Get up in the morning, get ready, which entails taking a shower, getting dressed, combing my hair, brushing teeth. I normally get breakfast depending on how I'm feeling, how my physical condition is how – I'm going to cook or what I'm going to eat. Then I usually – by this time I'm already – my legs are in pain, my leg is swollen. I go lay down, maybe, or sit down on a comfortable seat and I can do that maybe one or two hours before I can go and get ready to do maybe a load of laundry or go food shopping, which I usually try to do myself.
>
> Normally I can do light things at home, but I have to take breaks in between, I can't finish them at one – at one – in one step basically. And that's, again, because of my back or the carpal tunnel or the arthritis in my hands. And the injury that I have in my legs, if I lift anything it does take a toll on

9

the bones and just, you know, sometimes it's worse than others because of the weather. I – I told the – the doctor that the arthritis, when it's cloudy or rainy it's worse. So it just depends on how long I can stand and how long I can tolerate the pain and the swelling in my legs, sir.

(AR 63.)

Plaintiff also testified as follows: Plaintiff is staying at a friend's house at the moment. (AR 60-61.) She sometimes drives. (AR 61.) She has problems using her hands, *e.g.*, to button her clothes or zip things closed, about half the time, and has difficulty gripping things. (AR 67.) Plaintiff is unable to do any chores related to moving things that are twenty pounds or heavier. (AR. 67.) However, she could move something twenty pounds once, but not again. (AR 67-68.)

Plaintiff is very stressed, which causes stomach pain and headaches that affect her ability to see and eat. (AR 68.) Plaintiff has problems concentrating. (AR 68.) For example, if she is watching a movie for fifteen or twenty minutes she has no idea what is going on. (AR 68.) Plaintiff has difficulties interacting with people because she is "not feeling very sociable now." (AR 68.) She declines invitations to go places where she would have to be there more than two hours. (AR 68.) For example, she cannot go to a movie because her back is not well enough to sit through even half the movie. (AR 68.) Plaintiff is very depressed and feels very frustrated by her situation. (AR 68.) If she is not crying, she just feels really bummed out and does not want to talk to anyone. (AR 69.)

In addition to carpal tunnel issues, the arthritis in Plaintiff's hands also prevents her from doing her past work. (AR 71.) She has pinched nerves in her neck which causes her arms to hurt and get weak and numb. (AR 71.) She also has pinched nerves in her back that make her legs go numb after she has been sitting for 15 to 30 minutes. (AR 71.) Plaintiff has pain in her left tibia, which she previously fractured, as well as her right one because she has been using it so much, and in her hips. (AR 71-72.)

Moving her arms affects the pinched nerves in her neck and bothers her when she is folding laundry and when she raises her arms above a certain level. (AR 72.) The numbness in her arms gets worse when she raises them above chest height. (AR 72.)

However, Plaintiff can comfortably raise her arms to chest height. (AR 72.) Plaintiff feels cervical pain with and without activity. (AR 72.) Without activity, Plaintiff's pain level ranges from a three to seven, depending on the day. (AR 72-73.) Plaintiff keeps her activity low so that she can function. (AR 73.) When her neck is stiff, she cannot really turn or drive. (AR 73.) Plaintiff doesn't feel well enough to drive a car a couple of times a week. (AR 73.)

There is very little time Plaintiff is not in pain. (AR 73.) Plaintiff takes five different medications. (AR 73.) She mainly takes Norco for the pain, but also takes Tylenol and some over-the-counter ointment. (AR 74.)

Plaintiff can get up and groom herself and get dressed daily, although she has difficulty sometimes. (AR 74.) She was getting more help before, but recently has been trying to do things on her own. (AR 74.) After breakfast, Plaintiff lays down for two or three hours because her leg is swollen, unless she has an appointment she needs to attend. (AR 74.)

## 2. Applicable Law

It is well established in the Ninth Circuit that if the claimant has produced objective medical evidence of impairments that could reasonably be expected to produce some degree of pain and/or other symptoms and the record is devoid of any affirmative evidence of malingering, the ALJ may reject the claimant's testimony regarding the severity of the claimant's pain and/or other symptoms only if the ALJ makes specific findings stating clear and convincing reasons for doing so. *See Smolen v. Chater*, 80 F. 3d 1273, 1281-92 (9th Cir. 1996); *Dodrill v. Shalala*, 12 F.3d 915, 918 (9th Cir. 1993); *Bunnell v. Sullivan*, 947 F. 2d 341, 343 (9th Cir. 1991); *Cotton v. Bowen*, 799 F.2d 1403, 1407 (9th Cir. 1986).

It is incumbent on the ALJ to specify which statements of Plaintiff concerning her symptoms and functional limitations were not credible and in what respect the statements lacked credibility. *See Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir. 1998); *see also Lester v. Chater*, 81 F.3d 821, 834 (9th Cir. 1995), as amended (Apr. 9, 1996) ("General findings are insufficient; rather, the ALJ must identify what testimony is not credible and

what evidence undermines the claimant's complaints."). The ALJ is guided by "ordinary techniques of credibility evaluation," and may consider inconsistencies with the medical record or in the claimant's testimony, unexplained failures to seek treatment, and whether the claimant engages in activities of daily living that are inconsistent with the alleged symptoms. *See Molina v. Astrue*, 674 F.3d 1104, 1112-13 (9th Cir. 2012) (citations omitted).

An ALJ's assessment of pain severity and claimant credibility is entitled to "great weight." *Weetman v. Sullivan*, 877 F.2d 20, 22 (9th Cir. 1989); *see also Nyman v. Heckler*, 779 F.2d 528, 531 (9th Cir. 1986). "When evidence reasonably supports either confirming or reversing the ALJ's decision, [courts] may not substitute [their] judgment for that of the ALJ." *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1196 (9th Cir. 2004).

### 3. Analysis

The ALJ made the following statement regarding Plaintiff's credibility:

> After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to produce the above alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision. Accordingly, these statements have been found to affect the claimant's ability to work only to the extent they can reasonably be accepted as consistent with the objective medical and other evidence.

(AR 14.)

Because the Commissioner has not argued affirmative evidence of malingering, the Court will apply the "clear and convincing" standard to the ALJ's adverse credibility determination. *See Burrell v. Colvin*, 775 F.3d 1133, 1136 (9th Cir. 2014) (applying "clear and convincing" standard where the government did not argue that a lesser standard should apply based on evidence of malingering); *see also Ghanim v. Colvin*, 763 F.3d 1154, 1163 n.9 (9th Cir. 2014) (same).

The Court discerns the following three reasons in the ALJ's decision for his adverse credibility determination: (1) "despite her impairment, [Plaintiff] has engaged in somewhat normal level of daily activity and interaction"; (2) "[t]he treatment records reveal [Plaintiff] received routine, conservative and non-emergency treatment since the alleged onset date"; and (3) "the objective findings in this case fail to provide strong support for [Plaintiff's] allegations of disabling symptoms and limitations." (AR 14-15.) The Court will address each reason below.

### a. *Activities of Daily Living*

The first reason cited by the ALJ in support of his adverse credibility determination is Plaintiff's daily activities and interactions, which, according to the ALJ, "bear at least some similarity to those . . . necessary for obtaining and maintaining employment." (AR 14.) The ALJ notes in this regard that Plaintiff indicated she "drives, does laundry, shops, and handles her hygiene." (AR 14.) Moreover, the ALJ points to Plaintiff's Function Report where Plaintiff acknowledges that she "lives with friends, cleans, watches television, takes care of a cat, prepares meals, dusts, goes outside every day, drives, can go out alone, handles her finances, and has no problem getting along with family, friends, neighbors or others." (AR 14.) The ALJ characterized these daily activities and interactions as "somewhat normal." (AR 14.)

The Ninth Circuit has set forth "two grounds for using daily activities to form the basis of an adverse credibility determination": evidence that the claimant's daily activities either (1) contradict the claimant's other testimony, or (2) meet the threshold for transferable work skills. *See Orn v. Astrue*, 495 F.3d 625, 639 (9th Cir. 2007). Here, neither of these grounds apply.

As an initial matter, the ALJ erred by mischaracterizing Plaintiff's testimony. *See Garrison v. Colvin*, 759 F.3d 995, 1015-16 (9th Cir. 2014) (finding that the ALJ committed an error when she mischaracterized the plaintiff's testimony regarding her daily activities). Although Plaintiff testified that she sometimes feeds the cat, her roommate heavily assists with most other cat-related tasks, such as cleaning the litter box. (AR 348.) Plaintiff also

indicated that while she prepares meals, she is limited to foods that take her ten minutes "max" to prepare, like cereal, TV dinners, and soup. (AR 349.) Plaintiff testified that she can clean, but emphasized that she is limited to "light dusting" for five to ten minutes per week because "everything else causes pain." (AR 349.) Plaintiff acknowledged that she watches television, but she can only watch for about fifteen minutes before her focus is lost due to her medical impairments. (AR 351.) Plaintiff testified that after performing such activities she often must lie down and rest for a couple hours between each task because of the pain. (AR 63.)

In regard to her mental impairments, the ALJ notes that Plaintiff "has no problem getting along with family, friends, neighbors or others." (AR 14.) However, when Plaintiff testified to interacting with others outside her home, she stated, "I don't feel like talking to . . . people sometimes []. I'm just like so depressed and if I'm not crying I just feel like really bummed out and I don't even want to talk to anybody." (AR 69.) Plaintiff also testified that she has difficulties interacting with people because she is "not feeling very sociable now." (AR 68.)

Had the ALJ properly characterized Plaintiff's testimony, there would be no apparent inconsistencies between Plaintiff's ability to engage in her daily activities and her testimony regarding her physical and mental impairments. *See e.g.*, *Diedrich v. Berryhill*, 874 F.3d 634, 642-43 (9th Cir. 2017) (finding the claimant's ability to perform daily activities including personal hygiene, cooking, taking care of a cat, household chores, and shopping not a clear and convincing reason to find her less than fully credible in light of her other limitations); *Garrison*, 759 F.3d at 1016 (finding the claimant's ability to talk on the phone, prepare meals once or twice a day, occasionally clean one's room, and, with significant assistance, care for one's daughter, all while taking frequent hours-long rests, avoiding any heavy lifting, and lying in bed most of the day, to be consistent with her pain testimony and consistent with an inability to function in a workplace environment).

The daily activities identified by the ALJ are also not readily "transferable to a work environment." *See Ghanim*, 763 F.3d at 1165 (internal quotation marks omitted). "House

chores, cooking simple meals, self-grooming, paying bills, writing checks, and caring for a cat in one's own home, as well as occasional shopping outside the home, are not similar to typical work responsibilities." *Diedrich*, 874 F.3d at 643. However, even if the Court were to accept the ALJ's conclusory statement that Plaintiff's daily activities and interactions "bear at least some similarity to those . . . necessary for obtaining and maintaining employment," the ALJ does not identify any evidence or make specific findings to suggest that Plaintiff was performing these tasks "with the consistency and persistence that a work environment requires." *Id.*; *see also Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1996) (finding that "if a claimant is able to spend a substantial part of his day engaged in pursuits involving the performance of physical functions that *are* transferable to a work setting," an adverse credibility finding may be warranted); *Burch v. Barnhart*, 400 F.3d 676, 681 (9th Cir. 2005) ("[I]f a claimant engages in numerous daily activities involving skills that could be transferred to the workplace, the ALJ may discredit the claimant's allegations upon making specific findings relating to those activities.").

The Court therefore finds that the first reason cited by the ALJ does not constitute a clear and convincing reason for not crediting Plaintiff's subjective pain and symptom testimony.

### b. *Routine, Conservative, and Non-Emergency Treatment*

The next reason cited by the ALJ in support of his adverse credibility determination is that Plaintiff had received "routine, conservative and non-emergency treatment since the alleged onset date." (AR 15.) "[E]vidence of 'conservative treatment' is sufficient to discount a claimant's testimony regarding severity of an impairment." *Parra v. Astrue*, 481 F.3d 742, 751 (9th Cir. 2007) (quoting *Johnson v. Shalala*, 60 F.3d 1428, 1434 (9th Cir. 1995)); *see also Meanel v. Apfel*, 172 F.3d 1111, 1114 (9th Cir. 1999) (finding the ALJ properly rejected the plaintiff's "claim that she experienced pain approaching the highest level imaginable" as it was inconsistent with the "minimal, conservative treatment" that she received). For the following reasons, the Court finds that this does not constitute a clear and convincing reason for the ALJ's adverse credibility determination.

First, the ALJ fails to specifically identify the portions of the record that support his determination that Plaintiff only received "routine, conservative and non-emergency treatment since the alleged onset date." The Ninth Circuit is clear that an ALJ must make specific findings justifying his decision. *See Connett v. Barnhart*, 340 F.3d 871, 873 (9th Cir. 2003) (citing *Dodrill v. Shalala*, 12 F.3d 915, 917 (9th Cir. 1993)). A finding that a claimant's testimony is not credible "must be sufficiently specific to allow a reviewing court to conclude the adjudicator rejected the claimant's testimony on permissible grounds and did not arbitrarily discredit a claimant's testimony regarding pain." *Bunnell*, 947 F.2d at 345-46 (internal quotation marks and citations omitted). Here, the ALJ does not discuss Plaintiff's treatment in his decision, except for the statement that Plaintiff "attended only two therapy sessions of the six that were approved due to physical pain she reportedly was experiencing in pain therapy sessions." (AR 16-17 (citing AR 893).) As this statement is insufficient to adequately identify the portions of the record that support a finding of routine, conservative, and non-emergency treatment, the Court finds that this is not a clear and convincing reason for rejecting Plaintiff's testimony.

Second, the objective evidence the ALJ does discuss in his decision and the underlying record do not suggest that Plaintiff's treatment was routine and conservative. In his decision, the ALJ cites the numerous magnetic resonance imaging ("MRI") tests, x-rays and/or computerized tomography ("CT") scans of Plaintiff's left knee, pelvis, spine, left tibia and fibula, and/or lower extremity conducted between November 3, 2012 and May 16, 2016. (AR 15-16.)[1] This does not suggest a conservative course of treatment. Rather, it suggests an individual with an ongoing condition for whom treatment is not

---

[1] In this same section of his decision, the ALJ also notes that Plaintiff was diagnosed with "left knee posttraumatic chronic pain, slowly improving, with no evidence of derangement; and right hip and lateral thigh pain, most consistent with iliotibial band syndrome," "left knee posttraumatic pain, likely secondary to osteoarthritis," "degenerative disc disease C4-C6," "mild lower lumbar spondylosis," "cervical and lumbar disc disease [with] neck pain and low back pain," and osteoporosis. (*Id.*)

working (*i.e.*, alleviating her pain) and doctors who find her complaints credible enough to continue to order testing. Moreover, as noted by the ALJ, an October 2015 MRI indicated a "suspected reinjury of a proximal tibial metaphysis fracture mostly involving the lateral plateau," and "suspected partial separation of the lateral head of the gastrocnemius muscle from its anterior sheath at the level of the knee joint with gastrocnemius myositis," thus suggesting that the continued testing was warranted. (AR 16 (citing 685).)

Lastly, Plaintiff testified during the administrative hearing that she was taking five medications, including Norco, Tylenol, and an over-the-counter ointment for the pain. (AR 74; *see also* AR 398, 395, 400.) Her underlying medical records indicate that she had also been prescribed Gabapentin, Cyclobenzaprine Hydrochloride, and Tramadol for the pain but found that the Tramadol and other nonsteroidal anti-inflammatory drugs ("NSAIDS") did not alleviate her symptoms. (*See* AR 398-99, 402, 403, 409, 430.) In addition, Plaintiff underwent frequent physical therapy, but only occasionally found it helpful. (*See* AR 398, 430, 439, 441, 450-75, 477-515, 588-600, 700-08, 718-40, 879-89.) Therefore, although "[i]mpairments that can be controlled effectively with medication are not disabling for the purpose of determining eligibility for [social security] benefits," *Warre v. Comm'r of Soc. Sec. Admin.*, 439 F.3d 1001, 1006 (9th Cir. 2006), nothing in the record suggests that Plaintiff's pain was effectively controlled by medication.

Accordingly, the Court finds that the second reason cited by the ALJ does not constitute a clear and convincing reason for not crediting Plaintiff's subjective pain and symptom testimony.

### c. *Lack of Objective Medical Evidence*

The final reason cited by the ALJ in support of his adverse credibility determination is the lack of objective medical evidence to support Plaintiff's allegations. (AR 15.) However, since the ALJ's other stated reasons were legally insufficient to support his adverse credibility determination, this remaining reason (*i.e.*, the lack of objective medical support) cannot be legally sufficient by itself. *See Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 883-85 (9th Cir. 2006) (where the ALJ's initial reason for his adverse credibility

determination was legally insufficient, his sole remaining reason premised on lack of medical support for claimant's testimony was legally insufficient); *Light v. Soc. Sec. Admin.*, 119 F.3d 789, 792 (9th Cir. 1997) ("[A] finding that the claimant lacks credibility cannot be premised wholly on a lack of medical support for the severity of his pain."); *cf. Burch* 400 F.3d at 681 (noting that "lack of medical evidence cannot form the sole basis for discounting pain testimony").

Accordingly, the Court finds that the ALJ erred in rejecting Plaintiff's subjective symptom and pain testimony.

**B.    Treating Physicians**

Plaintiff's second and third claims of error address whether the ALJ, in determining that Plaintiff was capable of working, failed to properly consider the opinions of Dr. Avery and Dr. Paniccia, Plaintiff's treating physicians. (ECF No. 13 at 25-35.)

1.    <u>Applicable Law</u>

Medical opinions are among the evidence that the ALJ considers when assessing a claimant's ability to work. *See* 20 C.F.R. §§ 404.1527(b), 416.927(b). Case law distinguishes among the opinions of three types of physicians: (1) those who directly treated the claimant (treating physicians), (2) those who examined but did not treat the claimant (examining physicians), and (3) those who did neither (nonexamining physicians). *Lester*, 81 F.3d at 830. The medical opinion of a claimant's treating physician is given "controlling weight" so long as it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record." *Trevizo v. Berryhill*, 871 F.3d 664, 675 (9th Cir. 2017) (quoting 20 C.F.R. § 404.1527(c)(2)). "When a treating physician's opinion is not controlling, it is weighted according to factors such as the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability, consistency with the record, and specialization of the physician." *Id.* (citing 20 C.F.R. § 404.1527(c)(2)-(6)). Greater weight is also given to

the "opinion of a specialist about medical issues related to his or her area of specialty." *Revels v. Berryhill*, 874 F.3d 648, 654 (9th Cir. 2017) (quoting 20 C.F.R. § 404.1527(c)(5)).

"If a treating or examining doctor's opinion is contradicted by another doctor's opinion, an ALJ may only reject it by providing specific and legitimate reasons that are supported by substantial evidence." *Id.* (quoting *Bayliss v. Barnhart*, 427 F.3d 1211, 1216 (9th Cir. 2005)); *see also Reddick*, 157 F.3d at 725 ("[The] reasons for rejecting a treating doctor's credible opinion on disability are comparable to those required for rejecting a treating doctor's medical opinion."). "The ALJ can meet this burden by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989) (quoting *Cotton*, 799 F.2d at 1408).

"The opinion of a nonexamining physician cannot by itself constitute substantial evidence that justifies the rejection of the opinion of either an examining physician *or* a treating physician." *Lester*, 81 F.3d at 831 (emphasis in original). However, "[o]pinions of a nonexamining, testifying medical advisor may serve as substantial evidence when they are supported by other evidence in the record and are consistent with it." *Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595, 600 (9th Cir. 1999) (citing *Andrews v. Shalala*, 53 F.3d 1035, 1041 (9th Cir. 1986)).

### 2. Dr. Avery

Plaintiff contends that the ALJ improperly rejected Dr. Avery's opinion in determining Plaintiff's ability to work. (ECF No. 13 at 25-35.)

#### a. *Background*

Dr. Avery began seeing Plaintiff at Scripps in March 2014. (AR 891, 409-13.) He saw her approximately every three months through at least April 2016. (*See* AR 891, 745.) During her first visit, Dr. Avery noted that Plaintiff had fractured her left tibia in 2011, with subsequent hardware removal. (AR 409.) Plaintiff's earlier medical records indicate that Plaintiff experienced a left tibia plateau complex fracture on January 21, 2011. (AR 626.) She subsequently underwent a left tibial plateau open reduction and internal fixation

on January 23, 2011.  (AR 626.)  She was also subsequently found to have left foot third and fourth metatarsal fractures, which were treated with closed treatment.  (AR 626.)  Plaintiff developed posttraumatic symptomatic below-knee DVT.  (AR 626.)  On January 18, 2013, Plaintiff underwent a left knee surgery and proximal tibia hardware removal.  (AR 613.)  Her surgeon was Dr. Bongiovanni.  (AR 613.)  Post-operation, Plaintiff was diagnosed with left knee pain, posttraumatic, hardware irritation; left knee medial meniscus tear; left knee lateral meniscus tear; and left knee chondromalacia of the patella.  (AR 613.)  Plaintiff also had carpal tunnel surgery on her right wrist in or around 1996.  (AR 400, 478, 611.)

As Plaintiff's primary care provider, based on Plaintiff's medical history and complaints of ongoing pain, Dr. Avery ordered x-rays, physical therapy, and orthopedic consultations on her behalf.  (*See, e.g.*, AR 416, 419, 421, 440-41, 483, 581-82, 798.)[2]  Dr. Avery also examined Plaintiff himself.  (*See, e.g.*, AR 409-13, 398-401, 779-82, 775-78, 767-70, 837-41, 751-55, 756-60, 746-50, 741-45.)  During his examinations, Dr. Avery noted that Plaintiff had decreased range of motion in her neck and spine, and consistently observed that she had difficulty walking and needed a cane.  (*See* AR 413, 401, 782, 778, 770, 840, 755, 759, 750, 744; *see also* AR 402-04, 765.)  Dr. Avery also noted on one occasion that Plaintiff had decreased range of motion with flexion in her right wrist and could not perform Phalen's test.  (AR 778.)

///

///

///

---

[2]    A May 6, 2014 x-ray of Plaintiff's cervical spine ordered by Dr. Avery concluded that she had moderate degenerative disc disease C4-C5 and mild degenerative disc disease C5-C6.  (AR 416.)  The x-ray did not indicate a fracture or destructive osseous lesion.  (AR 416.)  In his April 20, 2016 Progress Note, Dr. Avery notes that Plaintiff "[w]as seen by ortho in Riverside last year, CT with poorly healing fxr still evident."  (AR 741; *see also* AR 747 ("CT scan that showed improved healing not full recovery").)

In his progress notes on March 15, 2015, Dr. Avery states the following after examining Plaintiff:

**Musculoskeleta**l: Digits and nails: Normal. Inspection/palpation of joints, bones, and muscles. Loss lumbar lordosis, left paraspinal muscle +2 involuntary spasm, right= +1 voluntary paraspinous muscle spasm. left knee with scaring medial inferior knee, mild edema over anterior shin, prominent tibial tubercle which patient localizes as the epicenter of her pain[.] The tibial tubercle is non TTP but very tender to light percussion with a reflex hammer. The infrapatellar tendon is normal and not TTP or tension. Valgus deformity, compression test reveal marked crepitus but no pain. no joint line TTP line tenderness left knee, no ligamentous laxity noted. Crepitus noted on flexion extension left knee. Patella compression test negative. Range of motion: Normal. Stability: Normal. Knee ligaments are intact and stable. Muscle strength/tone: Marked atrophy of L quadriceps, especially L vastus medialis. Patient can stand without using her arms to help, but it is painful. Patient walks with a L antalgic gait. Otherwise full strength 5/5 upper and lower ext.

. . .

**Neurologic**: Gait and station: Antalgic gait, decreased weight bearing left leg. Cranial nerves II-XII intact. Deep tendon reflexes 2+ and bilaterally equal. Sensation intact to light touch. Alert and oriented x3.

**Psychiatric**: Judgment and insight: Normal. Recent and remote memory: Normal. Mood and affect: Tearful on exam.

(AR 755.) Dr. Avery also states in these notes that Plaintiff needed a repeat x-ray of her left knee, especially the tibial tubercle area, a repeat orthopedic evaluation, and quad exercises for her left quad atrophy. (AR 755.) He concludes by stating that "Patient is having real pain, and deserves at least temporary medical disability and more formal physical therapy." (AR 755.)

Dr. Avery also referred Plaintiff to Dr. Bongiovanni, her orthopedic surgeon at Scripps Mercy, for follow up. (*See* AR 398, 402, 746, 761, 779, 827.) In May 2014, Dr. Bongiovanni concluded that Plaintiff had "[l]eft knee episodic pain, posttraumatic likely representative of mild posttraumatic degenerative joint disease, no acute fracture[,] chronic pain syndrome[, and] hypothyroidism." (AR 441.) During a subsequent visit in July 2014, Dr. Bongiovanni concluded that Plaintiff had "[l]eft knee posttraumatic pain, likely

secondary to osteoarthritis as seen on previous imaging studies." (AR 439.) During his examinations, Dr. Bongiovanni generally found Plaintiff's range of motion to be smooth and full and noted mild tenderness, pain, and swelling in her left knee. (AR 438, 440-41.) In May 2014, Dr. Bongiovanni determined that no further orthopedic surgery was advised at that time, and recommended physical therapy for range of motion, strengthening, gait training, and pain-relieving modalities. (AR 441.) He also offered Plaintiff a Synvisc injection for her left knee. (AR 441, 779.) This recommendation did not change in July 2014. (AR 439.)

Dr. Bongiovanni also ordered various CT scans, x-rays, and MRI tests, some of which pre-date Dr. Avery's treatment. On March 29, 2013, a CT examination showed that Plaintiff had "[n]ear-complete healed fractures of proximal tibia in anatomic alignment and early degenerative chances of the lateral tibial plateau." (AR 609.) On April 16, 2013, an MRI of Plaintiff's pelvis concluded that it was a "normal examination," and an MRI of Plaintiff's lumbar indicated, "Mild lower lumbar spondylosis. No central stenosis or evidence of nerve impingement. Right central annular tear L5-S1." (AR 519-20, 607-08.) On May 16, 2014, an x-ray of Plaintiff's left knee showed progressive sclerosis at the fracture site in the lateral tibial plateau and "[c]ontinued healing of lateral tibial plateau fracture." (AR 417-18, 442.)

b.    *Opinion*

On May 5, 2016, Dr. Avery, a physician who specializes in internal medicine, completed a "Medical Source Statement – Physical" for Plaintiff. (AR 890-92.) Dr. Avery opined on Plaintiff's ability to do work-related activities on a day-to-day basis in a regular, forty-hour work week setting. (*See* AR 890.) Dr. Avery opined that Plaintiff: (1) could lift and/or carry less than ten pounds; (2) could stand and/or walk less than two hours in an eight hour workday; (3) needed a cane for walking which he found medically necessary; (4) could sit for two to three hours with normal breaks in an eight-hour workday; (5) needed to alternate between sitting and standing and that breaks and lunch periods would not provide sufficient relief; and (6) required a change in position every five to fifteen minutes.

(AR 890-91.) Dr. Avery also opined that Plaintiff could occasionally climb, balance, stoop, kneel, crouch, crawl, reach, and handle (gross manipulation). (AR 891.) He further opined that Plaintiff could finger (fine manipulation) occasionally/rarely, had restrictions in feeling, and could not move machinery. (AR 891.) Dr. Avery added that Plaintiff could care for herself. (AR 892.)

Next, Dr. Avery opined that Plaintiff had no capacity to lift, push, or pull over 10 pounds, and could not engage in continuous sitting or standing, overhead work, and squatting or kneeling. (AR 892.) He further opined that Plaintiff had partial capacity to lift, push, or pull 10 pounds or less and to use her hands. (AR 892.) Based on his findings, Dr. Avery concluded that Plaintiff could perform limited part-time work and could not perform sedentary/clerical work. (AR 892.) Dr. Avery identified Plaintiff's prognosis as "To be Determined" as she needed an orthopedic evaluation. (AR 891.)

In determining what Plaintiff could lift and/or carry, Dr. Avery stated that he relied on her weakness on examination, her patient history, and her history of "left tibia fxr and DJD cervical spine." (AR 890.) In determining Plaintiff's ability to stand and/or walk, Dr. Avery stated that he relied on weakness in Plaintiff's left leg and her chronic pain and "tib/fib fracture." (AR 890.) In determining Plaintiff's ability to sit and alternate standing and sitting, Dr. Avery stated that he relied on Plaintiff's neuropathy, the degeneration of her cervical spine, and her patient history. (AR 890.) Lastly, in determining Plaintiff's additional physical and environmental restrictions, including manipulations, Dr. Avery stated that he relied the Plaintiff's "DJD cervical spine," her carpal tunnel syndrome, her patient history, and her abnormal gait secondary to pain. (AR 891.)

### c. *Analysis*

The ALJ gave Dr. Avery's opinion little weight for the following reasons:

> [Dr. Avery's opinion] is not well supported by objective evidence and it is inconsistent with the record as a whole. Dr. Avery primarily summarized in the treatment notes the claimant's subjective complaints, diagnoses, and treatment, but he provided few specific objective clinical or diagnostic findings to support the functional assessment. More importantly, his opinion

is inconsistent with the record as a whole, including the objective findings already discussed above in this decision, which show mild and moderate findings. [Dr. Avery's] opinion is also inconsistent with the claimant's admitted activities of daily living that have already been described above in this decision.

(AR 17.)

Because Dr. Avery's opinion was contradicted by medical expert Dr. Sklaroff (AR 36-39) and state agency review physicians Dr. Wong (AR 126-28, 137-39) and Dr. Vu (AR 150-53, 161-64), who opined that Plaintiff had only light limitations, the ALJ was required to provide specific and legitimate reasons for rejecting Dr. Avery's opinion. *Bayliss*, 427 F.3d at 1216. The Court will address each of these reasons in turn.

i. Not Supported By Objective Medical Record and Inconsistent with the Record as a Whole

The first reason proffered by the ALJ for rejecting Dr. Avery's opinion was that it "is not well supported by objective evidence and it is inconsistent with the record as a whole." (AR 17.) "[A]n ALJ may discredit treating physicians' opinions that are conclusory, brief, and unsupported by the record as a whole, . . . or by objective medical findings." *Batson*, 359 F.3d at 1195 (citing *Tonapetyan v. Halter*, 242 F.3d 1144, 1149 (9th Cir. 2001)); *see also Tommasetti v. Astrue*, 533 F.3d 1035, 1041 (9th Cir. 2008) (finding that an inconsistency or "incongruity" between a treating physician's opinion and her underlying medical records is a specific and legitimate reason for rejecting the physician's opinion); *Bayliss*, 427 F.3d at 1216 (finding that a contradiction or "discrepancy" between a treating physician's opinion and his underlying notes is a clear and convincing reason for not relying on the doctor's opinion); 20 C.F.R. §§ 404.1527(c)(4) ("Generally, the more consistent a medical opinion is with the record as a whole, the more weight we will give to that medical opinion."), 416.927(c)(4) (same). "An ALJ may also reject a treating physician's opinion if it is based 'to a large extent' on a claimant's self-reports that have been properly discounted as incredible." *Tommasetti*, 533 F.3d at 1041 (citing *Morgan*, 169 F.3d at 602).

Here, the ALJ set forth a detailed and thorough summary of the facts and conflicting clinical evidence in his decision. *See Magallanes*, 881 F.2d at 751. The ALJ summarized the results of Plaintiff's x-rays, MRI tests, and CT scans, which primarily showed continued healing of her left tibia, no fracture or dislocation of her left knee, "normal" or "mild" results from scans on her pelvis and lumbar spine, and normal strength in her lower extremities, with "no limp," and reflexes, sensation, and pulses within "normal limits." (AR 15-16.) Based on the foregoing, the ALJ concluded that Dr. Avery's opinions were not "well supported by objective evidence" and were "inconsistent with the record as a whole." (AR 17.) The ALJ added that "Dr. Avery primarily summarized in his treatment notes the claimant's subjective complaints, diagnoses, and treatment, but he provided few specific objective clinical or diagnostic findings to support the functional assessment." (AR 17.) In conclusion, the ALJ stated that, "More importantly, [Dr. Avery's] opinion is inconsistent with the record as a whole, including the objective findings discussed above in this decision, which show mild and moderate findings." (AR 17.) The Court finds that these are specific and legitimate reasons that are supported by substantial evidence for rejecting Dr. Avery's opinions. Although Dr. Avery stated that he relied on objective evidence and clinical findings in reaching his opinions, his opinions are generally inconsistent with the mild to moderate findings of the underlying objective evidence.[3]

Plaintiff argues that substantial evidence that the ALJ "either omitted or mischaracterized" supports the opinions of Dr. Avery. (ECF No. 13 at 27.) Plaintiff points to the various times Dr. Avery noted that Plaintiff's left knee was swollen or tender or that

---

[3]   In July 2013, Dr. Bongiovanni re-reviewed Plaintiff's MRI studies on her L-spine, pelvis, hips, and right knee, and noted that they "have been really unremarkable." (AR 603-04; *see also* AR 605.) In May 2014, Dr. Bongiovanni reviewed Plaintiff's left knee x-ray and stated that it reveals "no retained hardware" and "no obvious acute fracture" with only "mild degenerative changes." (AR 441.) *See* 20 C.F.R. §§ 404.1527(c)(5) ("We generally give more weight to the medical opinion of a specialist about medical issues related to his or her area of specialty than to the medical opinion of a source who is not a specialist."), 404.927(c)(5) (same).

Plaintiff had decreased range of motion in her left knee, spine, and/or neck. (*Id.* at 4-7.) However, as noted by the ALJ, Dr. Avery's examinations also revealed "no active synovitis, joint deformity or effusions," a normal range of motion, and "5/5 strength in the upper and lower extremities." (AR 15 (citing AR 770); *see also* 401, 413, 744, 755, 759, 770, 778, 782, 840.) Dr. Avery's notes indicated decreased range of motion in Plaintiff's neck on only two occasions and in her wrist on only one occasion. (*See* AR 401 (decreased ROM left rotation cervical), 413 (decreased ROM cervical rotation to the right and decreased ROM L spine), 778 (right wrist with decreased ROM with flexion, cannot perform Phalen's test and Tinnel's test elicits tingling throughout all digits).) In addition, Dr. Avery's notes frequently did not mention a swollen or tender knee. (*See* AR 413, 744, 755, 759, 770, 778, 782, 840; *but see* AR 401 (unable to fully extend left knee without pain), 750 (swelling left knee and pain with extension of knee), 744 (mild swelling left below knee with TTP).)

Plaintiff also points to Dr. Avery's observations that Plaintiff walks with a limp or an unsteady gait and needs an assistive device as information ignored by the ALJ. (ECF No. 13 at 4-7.) However, as stated by the ALJ, Plaintiff was also observed without a limp in September 2015. (AR 15 (citing AR 676).) She was further observed without a limp and able to walk normally in October and November 2015. (*See* AR 679, 690.) The Court further observes that Plaintiff's physical therapy notes also include such statements as: "Despite patients reports of severe radicular symptoms I find no advanced neurological symptoms including diminished reflex or weakness" (AR 701); and "Walks slowly without cane, for no obvious reason, except lack of confidence" (AR 462). As these statements are in line with the mild to moderate findings of the underlying objective evidence, the Court finds that the ALJ has provided a specific and legitimate reason for rejecting the opinions of Dr. Avery.

In any event, to the extent the medical records raise ambiguities, "the ALJ is the final arbiter with respect to resolving ambiguities in the medical evidence." *Tommasetti*, 533 F.3d at 1041; *see also Batson*, 359 F.3d at 1195 ("When presented with conflicting medical

opinions, the ALJ must determine credibility and resolve the conflict."); *Andrews*, 53 F.3d at 1039 ("The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and for resolving ambiguities.").

### ii.    Activities of Daily Living

The second reason proffered by the ALJ for giving little weight to the opinion of Dr. Avery was that the opinion is "inconsistent with the claimant's admitted activities of daily living." (AR 17.)  Inconsistency between a physician's opinion and a plaintiff's daily activities suffices as a specific and legitimate reason for discounting a physician's opinion if supported by substantial evidence from the record as a whole. *See Morgan*, 169 F.3d at 600-02.

Here, as set forth above, the Court has already determined that the ALJ mischaracterized Plaintiff's daily activities in his decision.  Therefore, the ALJ does not adequately identify any inconsistencies between Plaintiff's testimony regarding her activities of daily living and Dr. Avery's opinion.  Accordingly, the Court finds that this was not a specific and legitimate reason supported by substantial evidence in the record for rejecting Dr. Avery's opinion.  *See Revels*, 874 F.3d at 664 (finding the ALJ's determination that a treating physician's findings were inconsistent with the claimant's daily activities to be insufficient where the ALJ omitted highly relevant qualifications to the claimant's daily activities); *see also Trevizo*, 871 F.3d at 675-76 (finding the ALJ improperly relied on the claimant's daily activities to reject the treating physician's opinion where the ALJ had not adequately developed the record regarding the claimant's daily activities).

As the ALJ has provided at least one specific and legitimate reason for rejecting Dr. Avery's opinion, however, the Court finds that he did not err in affording Dr. Avery's opinion little weight.

### 3.    Dr. Paniccia

Plaintiff also contends that the ALJ improperly rejected the opinion of Dr. Paniccia, Plaintiff's treating physician, in determining her ability to work.  (ECF No. 13 at 27.)

### a. *Background*

Dr. Paniccia first conducted a mental health exam of Plaintiff on July 13, 2016. (AR 1001-02.) At the time Plaintiff was referred to Dr. Paniccia, she was already on Paxil (40 mg). (AR 1001.) Upon conducting his exam, Dr. Paniccia noted that Plaintiff was cooperative with a "logical/coherent and normal" thought process, as well as "normal" insight, orientation, streams of thought, judgment, intellectual functioning, sensory perception, general body movement, posture, and psychomotor activities. (AR 1001.) She was also alert, able to maintain, hold, and attend to conversation, and was oriented to person, place, and time. (AR 1001.) However, Dr. Paniccia also noted that Plaintiff made intermittent eye contact, her mood was depressed, her affect was consistent with her mood, her facial expression suggested sadness and depression, and she had suicidal ideation. (AR 1001.) Dr. Paniccia further noted that Plaintiff had impaired recall memory (immediate, recent, remote) and difficulty concentrating. (AR 1001.)

Dr. Paniccia diagnosed Plaintiff with "major depressive disorder, recurrent severe without psychotic features," and gave her a Global Assessment of Functioning ("GAF") rating of 49, which indicates "serious symptoms or serious impair[ment] in social, occupational, or school functioning." (AR 1002.) Dr. Paniccia increased Plaintiff's Paxil prescription to 60 mg. (AR 1002.) Dr. Paniccia also prescribed Trazodone for sleep as Plaintiff stated that she had insomnia. (AR 1001-02.)

Dr. Paniccia saw Plaintiff again on August 12, 2016. (AR 999-1000.) His notes reflect that Plaintiff was largely the same, except that she had no suicidal ideation, and her mood and affect were "unremarkable (euthymic)" and her facial expression suggested "no abnormalities." (AR 999.) Plaintiff reported sleeping better on the Trazadone and "feeling tired from exertion." (AR 999.)

Dr. Paniccia next saw Plaintiff on August 25, 2016. (AR 997-98.) Her mood was "anxious and depressed" and her facial expression suggested anxiety, sadness, and depression. (AR 997.) In addition to continuing the Paxil and Trazodone, Dr. Paniccia prescribed Buspar and gave Plaintiff a number for the County Access Line for one-on-one

therapy. (AR 998.) Plaintiff reported sleeping better and feeling tired from exertion. (AR 997.) Dr. Paniccia noted that Plaintiff was also anxious and depressed when he saw her on September 8, 2016 and October 6, 2016, but it was "overall less." (AR 993, 995.) Plaintiff again reported sleeping better and feeling tired from exertion and the pain. (AR 993, 995.)

b. *Opinion*

In a psychiatric review, dated July 20, 2016, Dr. Paniccia diagnosed Plaintiff with major depressive disorder which was "recurrent, severe [and] without psychotic features." (AR 900.) Dr. Paniccia indicated Plaintiff's signs and symptoms included the following: appetite disturbance with weight change, sleep disturbance, mood disturbance, memory impairment, anhedonia or pervasive loss of interests, feelings of guilt/worthlessness, difficulty thinking or concentrating, suicidal ideation, emotional withdrawal or isolation, decreased energy, and intrusive memories of traumatic experience. (AR 900.) Dr. Paniccia described his findings as "[consistent with] major depression." (AR 901.)

Dr. Paniccia noted that he increased Plaintiff's Paxil prescription on July 13, 2016 to 60 mg and added a Trazodone prescription of 50-150 mg at bedtime for sleep. (AR 901.) Dr. Paniccia described Plaintiff's prognosis as "fair at best" and found that Plaintiff's impairment had lasted or was expected to last at least twelve months. (AR 901.)

When asked to describe which impairments and symptoms would cause absence from work, Dr. Paniccia noted "problems with energy, focus, concentration, memory, stamina, anhedonia, [and] insomnia." (AR 902.) Based on his findings, Dr. Paniccia anticipated that Plaintiff would be absent from work more than three times a month and would be off task more than twenty percent of the work day. (AR 902.)

When filling out a survey of what degree Plaintiff's mental impairments affect her ability to perform work-related activities on a full-time, day-to-day basis in a regular work setting, Dr. Paniccia marked "moderate limitations" on Plaintiff's ability to: (1) understand, remember, and carry out simple one or two step job instructions; (2) relate and interact with co-workers and the public; (3) accept instructions from supervisors; and (4) perform work activities without special or additional supervision. (AR 903.) Dr. Paniccia indicated

that Plaintiff would have "marked limitations" in: (1) performing detailed and complex instructions; (2) maintaining concentration, attention, persistence, and pace; and (3) maintaining regular attendance and performing work activities on a consistent basis. (AR 903.) Regarding Plaintiff's functional limitations, Dr. Paniccia indicated that Plaintiff would be moderately limited in her activities of daily living. (AR 903.) Dr. Paniccia further indicated that Plaintiff would have marked difficulties in maintaining concentration, persistence, or pace and marked difficulties maintaining social functioning. (AR 903.) Finally, Dr. Paniccia indicated that Plaintiff would have four or more repeated episodes of decompensation, each of an extended duration. (AR 903.) Based on his findings, Dr. Paniccia stated that, "Due to [a] 23 year history of depression, I feel she is permanently disabled." (AR 904.)

c. *Analysis*

The ALJ did not accord Dr. Paniccia's opinion substantial weight for the following reasons:

> [Dr. Paniccia's mental residual functional capacity] questionnaire is not supported by specific objective findings and signs. In fact, the opinion is inconsistent with the objective findings already discussed above in this decision, which show normal findings. [Dr. Paniccia's] opinion is also inconsistent with the claimant's admitted activities of daily living that have already been described above in this decision.

(AR 17-18.)

Because Dr. Paniccia's opinion was contradicted by state agency physicians Dr. Loomis (AR 125-26, 136-37) and Dr. Paxton (AR 149-50, 160-61), who opined no limitations, the ALJ was required to provide specific and legitimate reasons for rejecting Dr. Paniccia's opinion. *See Bayliss*, 427 F.3d at 1216. The Court will address each of these reasons below.

i. <u>Not Supported by Objective Medical Record</u>

The first reason proffered by the ALJ for giving little weight to the opinion of Dr. Paniccia was that "the opinion is not supported by specific objective findings and signs"

and is "inconsistent with the objective findings" discussed in the ALJ's decision, "which show normal findings." (AR 17-18.) As set forth above, "an ALJ may discredit treating physicians' opinions that are conclusory, brief, and unsupported by the record as a whole, . . . or by objective medical findings." *Batson*, 359 F.3d at 1195. An ALJ may also reject a treating physician's opinion where it is inconsistent with his underlying medical records. *See Tommasetti*, 533 F.3d at 1041; *Bayliss*, 427 F.3d at 1216. *Cf. Revels*, 874 F.3d at 663 (finding the ALJ failed to provide a specific and legitimate reason where the treating physician's opinion was consistent with his underlying treatment notes).

In his decision, the ALJ concludes that Dr. Paniccia's restrictions are "inconsistent with the objective findings" he discussed in his decision which show "normal findings." (AR 17-18.) However, the objective findings discussed in the ALJ's decision which purportedly show that Plaintiff's mental status examinations were within normal limits included, among others, Dr. Paniccia's own examinations. (AR 17 (citing AR 993, 995, 997, 999, 1001).) Upon review, the Court does not find that Dr. Paniccia's opinions are inconsistent with the objective findings in his mental status examinations.

The ALJ also relies on the notes of Tobias Desjardins, a licensed clinical social worker, for the proposition that Plaintiff's mental status examinations were within normal limits and therefore inconsistent with Dr. Paniccia's opinions. (AR 17 (citing AR 937-78).) Mr. Desjardins saw Plaintiff sixteen times between August 13, 2015 and January 5, 2016. (AR 937-78.) At each appointment, Mr. Desjardins noted that Plaintiff was cooperative and alert with insight intact and no abnormal thought content or suicidal ideation. (*See id.*) However, Mr. Desjardins also noted at each appointment that Plaintiff's mood was sad, depressed, and anxious, and her GAF score was 50, which indicates serious symptoms or serious impairment in social, occupational, or school functioning. (*See* AR 1002.)

During these sessions, Plaintiff reported having anxiety attacks 1-2 times per week and periods of crying or being teary and feeling helpless. (AR 956, 963, 965, 966, 970, 972.) Plaintiff occasionally cried or was teary throughout the session. (AR 956, 964, 967.)

Plaintiff also reported difficulty sleeping because of her anxiety and back pain, and lack of energy. (AR 956, 958, 960, 966.) In addition, Plaintiff reported memory problems, not feeling social, and losing weight. (AR 937, 947, 966.) Plaintiff frequently mentioned her physical leg, back, and hand pain and how hard it had been to manage. (AR 937, 939, 942, 945, 947, 950, 953, 958, 970, 966, 972, 976.) Based on the foregoing, the Court does not find that the Dr. Paniccia's opinions are inconsistent with Mr. Desjardins' treatment notes.

The ALJ also relies on notations in four of Plaintiff's medical records from Scripps stating that Plaintiff's judgment and insight were normal, her mood euthymic with appropriate affect, and that she was alert and oriented times three and had normal recent and remote memory. (AR 16 (citing AR 401, 413, 831, 854).) However, three of these visits took place in 2014 (1) to establish care, (2) to follow up to address Plaintiff's degenerative joint disease, chronic low back pain, and hypothyroidism, and (3) for a PAP smear. (See AR 398, 410, 852.) The fourth visit was a follow up examination with Dr. Avery on February 26, 2016. (AR 827-31.) Although Dr. Avery noted during Plaintiff's physical exam that Plaintiff's judgment and insight were normal, her recent and remote memory were normal, and her mood euthymic and affect appropriate, he also noted that Plaintiff had depression that was "poorly controlled." (AR 828.)

Lastly, the ALJ relies on an April 20, 2016 notation in Plaintiff's Scripps records, stating that Plaintiff was "improved on medication" and had "no suicidal and homicidal ideation," in addition to having normal insight and judgment, euthymic mood, and appropriate affect. (AR 16 (citing AR 741, 744).) However, the physician's note reads: "No [suicidal ideation/homicidal ideation] but tearful on exam. Overall improved on paxil but persistent. Prior seen by psychiatry and psychology. Refer to mental health psychiatry and psychology. Continue paxil." (AR 741.)

Based on the foregoing, the Court finds that the ALJ's statement that Dr. Paniccia's questionnaire is "not supported by specific objective findings and signs" and is "inconsistent with objective findings . . . which show normal findings" is not a specific and legitimate reason for rejecting Dr. Paniccia's opinion as it is not supported by the record

as a whole. With the limited exception of Plaintiff's memory, the various notes are not inconsistent with Dr. Paniccia's opinions. Moreover, given that the only inconsistent statements regarding Plaintiff's memory came during routine physical exams and there is no indication if or how the physicians tested Plaintiff's memory, the Court does not find that to be a specific and legitimate reason that is supported by substantial evidence.

ii.  <u>Activities of Daily Living</u>

The second reason proffered by the ALJ for giving little weight to the opinion of Dr. Paniccia is that the opinion is "inconsistent with the claimant's admitted activities of daily living" that were described in the ALJ's opinion. (AR 17.) As set forth above, the Court has already determined that the ALJ mischaracterized Plaintiff's daily activities in his decision and therefore this does not constitute a specific and legitimate reason supported by substantial evidence in the record for rejecting Dr. Paniccia's opinion.

Based on the foregoing, the Court finds that the ALJ erred in rejecting Dr. Paniccia's opinion.

## VI.    CONCLUSION AND RECOMMENDATION

The law is well established that the decision whether to remand for further proceedings or simply to award benefits is within the discretion of the Court. *See, e.g.*, *Salvador v. Sullivan*, 917 F.2d 13, 15 (9th Cir. 1990); *McAllister v. Sullivan*, 888 F.2d 599, 603 (9th Cir. 1989); *Lewin v. Schweiker*, 654 F.2d 631, 635 (9th Cir. 1981). Remand is warranted where additional administrative proceedings could remedy defects in the decision. *See, e.g.*, *Kail v. Heckler*, 722 F.2d 1496, 1497 (9th Cir. 1984); *Lewin*, 654 F.2d at 635. Remand for the payment of benefits is appropriate where no useful purpose would be served by further administrative proceedings, *Kornock v. Harris*, 648 F.2d 525, 527 (9th Cir. 1980); where the record has been fully developed, *Hoffman v. Heckler*, 785 F.2d 1423, 1425 (9th Cir. 1986); or where remand would unnecessarily delay the receipt of benefits, *Bilby v. Schweiker*, 762 F.2d 716, 719 (9th Cir. 1985).

Here, the Court has concluded that this is not an instance where no useful purpose would be served by further administrative proceedings; rather, additional administrative proceedings still could remedy the defects in the ALJ's decision.

For the foregoing reasons, this Court **RECOMMENDS** that Judgment be entered **REVERSING** the decision of the Commissioner denying benefits and **REMANDING** the matter to the Commissioner for further administrative action consistent with this decision.

Any party having objections to the Court's proposed findings and recommendations shall serve and file specific written objections within **fourteen (14) days** after being served with a copy of this Report and Recommendation. *See* Fed. R. Civ. P. 72(b)(2). The objections should be captioned "Objections to Report and Recommendation." A party may respond to the other party's objections within **fourteen (14) days** after being served with a copy of the objections. *See* Fed. R. Civ. P. 72(b)(2). *See id.*

**IT IS SO ORDERED.**

Dated: July 3, 2019

Hon. Jill L. Burkhardt
United States Magistrate Judge

18-cv-00801-JLS (JLB)